<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRADFORD C. VIOLETTE, | Civil Action No.: 03-5520 (JLL) |
| Plaintiff, | |
| v. | **O P I N I O N  &  O R D E R** |
| AJILON FINANCE, formerly, d/b/a ACCOUNTANTS ON CALL, and ADECCO, NA, | |
| Defendants. | |

**APPEARANCES:**

Nancy Erika Smith, Esq.
SMITH MULLIN, P.C.
240 Claremont Avenue
Montclair, NJ 07042

Mark A. Berman, Esq.
GIBBONS, DEL DEO, DOLAN,
GRIFFINGER & VECCHIONE
One Riverfront Plaza
Newark, NJ 07102

James P. Baker, Esq.
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104

**LINARES**, District Judge.

Presently before this Court are plaintiff Bradford C. Violette's (hereinafter "plaintiff" or

"Violette") motion for summary judgment, pursuant to Fed. R. Civ. P. 56(c), and defendants' Ajilon Finance, formerly d/b/a Accountants on Call, and Adecco, NA (hereinafter "defendants") cross-motion for summary judgment, pursuant to Fed. R. Civ. P. 56(c).  The Court has considered the parties' submissions, as well as the oral argument of the parties held on February 14, 2005.  For the reasons set forth below, this Court concludes that defendants' cross-motion for summary judgment is DENIED, and plaintiff's motion for summary judgment is GRANTED in part.

## BACKGROUND FACTS

The parties are quite knowledgeable about the underlying facts, and as the facts of this case have already been set out in the parties' papers and on the record during oral argument on February 14, 2005, the facts need not be reiterated in full for purposes of the present motion.  The relevant facts, however, will be discussed below and in more length in the appropriate legal discussion.

Plaintiff Bradford Violette was Recruited in 1988 by Accountants on Call (hereinafter "AOC"), a subdivision of defendant Adecco, and the predecessor of co-defendant Ajilon.  He was initially hired for the position of Vice President of the Data Processing and Placement Division.  His last position at AOC was that of Executive Vice President.  While working for AOC, plaintiff participated in three different pension plans: (1) the Non-Qualified Profit Sharing Plan (hereinafter "NQPSP"); (2) the Executive Deferred Compensation Plan (hereinafter "ECDP"); and (3) the Adecco, Inc. Non-Qualified Savings Plan (hereinafter "the 2001 Plan").  For purposes of this discussion, the Court will focus on the EDCP and the 2001 Plans. The EDCP, which is governed by California law, was established by Defendants in order to provide investment opportunities for highly-compensated employees.  Plaintiff was included in this plan in 1998.  At the heart of this controversy, lies the defendants' Non-Qualified Savings Plan, or 2001 Plan.  This Plan (which came

into effect on January 1, 2001) resulted from defendants' merger of the NQPSP and EDCP Plans. The balances of plaintiff's accounts in both the NQPSP[1] and the EDCP were combined under the 2001 Plan. The 2001 Plan's provisions are "to be construed, administered and enforced, to the extent not preempted by ERISA or other applicable federal law, in accordance with the applicable laws of the State of New York." (Adecco, Inc., Non-Qualified Savings Plan, p. 37, Section 13.6).

On November 30, 2001, plaintiff was terminated without cause and entered into a separation agreement and general release, whereby the parties agreed that plaintiff would continue to benefit from the NQPSP and the ECDP. This meant plaintiff would be bound by the terms of those plans, including the non-compete clauses contained therein. (Separation Agreement and General Release, p. 5, ¶ 18). Plaintiff was prohibited from competing between November 30, 2001 and November 30, 2002. After his dismissal from AOC, plaintiff founded his own company, Bradford Management Group (hereinafter "BMG"). BMG is a private management consultant business and executive search firm, which specializes in placing high-level executives (those earning $100K plus) in manufacturing operations, sales and marketing, healthcare/life sciences and leadership development positions. Defendants claim that plaintiff's business competes directly with their businesses.

Defendants specialize in temporary and permanent placement focused on the IT, finance and accounting, legal, telecom, sales, marketing, and engineering sectors. Defendants also claim that they are involved in the business of executive placement. (Declaration of Debbie Buchsbaum ISO Defendants' Motion for Summary Judgment, p. 2, ¶¶ 4-8 ). According to Ajilon's current website, they provide: "solutions in the following specialty areas: information technology, engineering, finance and accounting, legal, office support, and sales and marketing." (Excerpt from Ajilon

---

[1] Governed by the laws of the State of New York.

Mission Statement, available at http://www.ajilon.com). Plaintiff disputes that Adecco and Ajilon have been involved in placement of personnel other than in finance and accounting positions. He further argues that defendants' businesses haven't always included executive recruiting.

Defendants maintain that plaintiff, through BMG, has competed with their businesses in violation of non-compete provisions in the EDCP and 2001 Plans. Plaintiff contends that the businesses are not in competition because he only places high-level executives in permanent positions, while defendants' businesses only place lower-tier employees. Additionally, he argues that BMG does not serve the same clientele as Adecco and Ajilon. Believing that plaintiff had competed with their businesses in contravention of the non-compete clauses in the EDCP and 2001 Plan, the Non Qualified Programs Committee[2] (hereinafter "the Committee") refused to pay plaintiff $91,205.06 in employer matching funds and accrued investment from plaintiff's EDCP. This controversy arises out of defendants' refusal to pay plaintiff the above-quoted sum.

## DISCUSSION

### A.    Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001). "A 'genuine' issue is one where a reasonable jury, based on the evidence presented, could hold in the movant's favor with regard to that issue." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). When considering a motion for summary judgment, all evidence must be reviewed and all inferences drawn therefrom must be in the light most favorable to the nonmoving party.

---

[2] The Committee administers the 2001 Plan.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the moving party files a properly supported motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 256.  "The mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence of which the jury could reasonably find for the [nonmovant]."  Id. at 252.

Conclusory statements and arguments do not raise triable issues which preclude summary judgment.  Ridgewood Board of Educ. v. N.E., 172 F.3d 238, 252 (3d Cir. 1999).  Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Anderson, supra, 477 U.S. at 257 (citation omitted).  If the opponent fails to make a sufficient showing regarding an essential element of his or her case upon which he or she will bear the burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted.  Celotex Corp. v. Catrett, 477 U.S. 317, 321 (1986).

The Court's present task is to determine whether genuine issues of material fact exist and whether either plaintiff or defendants are entitled to judgment as a matter of law.

**B.**     **The 2001 Plan Controls**

As a threshold issue, this Court must determine which Plan is controlling, the EDCP or the 2001 Plan.  Defendants argued both in their brief and at oral argument, that the 2001 Plan applies to the case at hand.  In Defendants' Brief in Support of their Cross Motion for Summary Judgment (hereinafter "Def's Br. in Supp."), they state:

> The ADIA/NQPSP and the EDCP were merged to create the Adecco, Inc. Non-Qualified Savings Plan [the 2001 Plan], effective January 1, 2001, and the balances of Mr. Violette's accounts in both the

> ADIA/NQPSP and the EDCP were combined under the [2001 Plan]...The [2001] Plan is the only Plan that continues to exist and thus is the only Plan under which Mr. Violette can claim benefits.

(Def's Br. in Supp. at 4, 10) (emphasis added).  It is undisputed that defendants have the inherent power to amend and/or terminate the EDCP plan:

> 9.1 Amendments The Board of Directors shall have the right to amend this Plan from time to time, or to cancel any amendments. Amendments may not result in reduction of Participants' account balances, including previous earnings or losses, as of the date of the amendment.
>
> 9.2 Company's Right to Terminate The Company may partially or completely terminate the Plan . . . Plan terminations may not result in any reduction of Participants' account balances, including previous earnings or losses, as of the date of termination.

(Adecco, Inc. Executive Deferred Compensation Plan, p. 12).  Pursuant to the powers granted to them by section 9.2 of the EDCP, defendants terminated the EDCP and merged the funds contained therein, into the 2001 Plan.  Since the termination and merger of the EDCP were done in compliance with the EDCP's termination and merger procedures, the Court finds that the 2001 Plan is the only plan that applies to the present facts.

Plaintiff maintains that the terms of the EDCP are, nevertheless, controlling.  He claims that Defendants may not place additional burdens in order for him to collect his vested benefits.  The additional burden plaintiff refers to is the burden of proving that he has not competed with defendants' businesses.  This argument however, is without merit, as nothing in the EDCP prohibits defendants from modifying the non-compete clause at issue and imposing stricter standards of proof.  Furthermore, the termination and merger in question did not, as the plaintiff claims, result in the reduction of account balances.  As counsel for defendants properly notes, the plaintiff's account

balance on the last day of the EDCP's existence was the same as on the first day the 2001 Plan came into effect.

**C.      The 2001 Plan is a Top-Hat Plan**[3]

The Court must now determine whether the 2001 Plan qualifies as top-hat plan.  The Third Circuit recently defined a top-hat plan as: "'[a] plan which is [1] unfunded and [2]  is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees.'"  Ahearn v. Marsh & McLennan Companies, Inc., 124 Fed. Appx. 118, 119 (3d Cir. 2005) (citing Goldstein v. Johnson & Johnson, 251 F.3d, 433, 436 (3d Cir. 2001) (quoting Miller v. Eichleay Eng'rs, Inc., 886 F.2d 30, 34 n.8 (3d Cir. 1989) (relying on ERISA definition of top-hat plan at 29 U.S.C.A. § 1052(a) (2005).  Since top-hat plans are only intended to compensate highly-paid executives, the Department of Labor has reasoned that "such employees are in a strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees."  Ahearn, 124 Fed. Appx. at 119 (relying on DOL Opin. Letter 90-14 A, 1990 WL 123933, at *1 (May 8, 1990)).  For the present purpose, the Court need only note that top-hat plans are not subject to any of ERISA's substantive provisions, including its requirements for vesting and funding.  Goldstein, 251 F.3d at 442.  The

---

[3] Since the Court decides that the 2001 Plan is a top-hat plan, Section 514(a) of ERISA preempts plaintiff's state law claims: "the provisions of [title I] and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered under Section 4 of ERISA. Section 514(a) of ERISA applies equally to top-hat plans and to ERISA-governed plans.  See, e.g., Pane v. RCA Corp., 868 F.2d 631, 635 (3d Cir. 1989); and Bruno v. Hershey Foods, Corp., 964 F. Supp. 159, 163 (D.N.J. 1997) (applying Section 514(a) of ERISA to preempt state law claims related to top-hat plan).  Accordingly, this Court will not address plaintiff's claim that the non-compete clauses in the EDCP and 2001 Plans violate the state laws of New Jersey, New York and California.

Court will now proceed to determine (1) whether the 2001 Plan was unfunded and (2) whether it is maintained for the benefit of a select group of highly paid employees.

### 1.      The 2001 Plan is Unfunded

"The burden of establishing that a plan fits the 'top hat' exclusion is on the party asserting that it is a 'top hat' plan." In re The IT Group, Inc., 305 B.R. 402 (Bankr. D.Del. 1999) (relying on Carrabba v. Randalls Food Mkts., Inc., 38 F. Supp. 2d 468, 477 (N.D. Tex. 1999). Therefore, the Court will now examine defendants' submissions and determine whether they met their burden of establishing that the 2001 Plan qualifies as a top-hat plan.

Defendants argue the 2001 Plan was unfunded within the meaning of ERISA. In support of their position, they provided the Court with the text of the plan and with the affidavit of Greg Nevolla.   "[A]ny determination of the 'unfunded' status of a 'top hat'. . . plan of deferred compensation requires an examination of the surrounding facts and circumstances, including the status of the plan under non-ERISA law." Miller v. Heller, 915 F. Supp. 651, 658 (S.D.N.Y. 1996). "The 'essential feature' of a funded deferred compensation plan is that its assets are 'segregated' from the employer's 'general assets' and are not 'available to general creditors if the employer becomes insolvent.'" In re The IT Group, 305 B.R. at 407 (quoting Miller, 915 F. Supp. at 657). The Second Circuit has held that "the question a court must ask in determining whether a plan is unfunded is: 'can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation?'" Demery v. Extebank Deferred Compensation Plan, 216 F.3d 283, 287 (2d Cir. 2000) (quoting Miller, 915 F. Supp. at 660). The 2001 Plan provides, in relevant part:

> 6.6 <u>Participants Remain General Creditors</u>. All amounts credited to a Participant's Account under the Plan shall continue for all purposes to be a part of the <u>general assets</u> of his or her Employer. Each Participant's interest in the Plan shall make him or her only a <u>general creditor</u> of the Employer[.]

(Adecco, Inc. Non-Qualified Savings Plan, p. 19) (emphasis added).

The plan documents in question clearly indicate that Plan participants are only general/unsecured creditors of the employer. Applying the Second Circuit's test in <u>Demery</u> to the facts at hand, it is clear that the 2001 Plan is unfunded for purposes of ERISA. The terms of the 2001 Plan clearly do not give plaintiff greater legal rights to the amounts credited to his account than those possessed by an unsecured creditor. Furthermore, under the 2001 Plan, plaintiff's account became a part of the defendants' general assets. (Adecco, Inc. Non-Qualified Savings Plan, pp. 19-20, Section 6.6). <u>See</u>, <u>Belsky v. First Nat'l Life Ins. Co.</u>, 818 F.2d 661, 664 (8th Cir. 1987) ( "A plan is . . . unfunded when [the participants] are paid from the employer's general assets."). For the above-cited reasons, this Court finds that the 2001 Plan is unfunded within the meaning of ERISA.[4]

**2.     The 2001 Plan is Maintained for the Benefit of a Select Group of Highly Compensated Employees**

The Court now turns to whether defendants' 2001 Plan satisfies the second requirement of

---

[4] Plaintiff maintains that regardless of what the language of the plan indicates, the plan is funded, and he is 100% vested. (Certified Transcript of Oral Arguments held on 02/14/05, pp. 6, 7, 8). This argument, however, overlooks the technical definition ERISA gives to the words "unfunded/funded." The word "funded" (in ERISA jargon) does not mean that the participant's account has actual funds. As noted above, the ERISA concept of funding has to do with whether a plan participant can assert greater legal rights over funds credited to his/her account, than those of an unsecured creditor. Since the Court has determined that, as a matter of law, plaintiff possesses no such rights, his argument that the 2001 Plan is funded is without merit. Furthermore, as the plan in question is a top-hat plan, exempt from ERISA's vesting provisions, the issue of vesting is not governed by ERISA, though the parties (as with any other contract provision) are free to contract vesting.

a  top-hat plan: that the plan be maintained for a select group of highly paid employees.   The

Preamble to the 2001 Plans provides, in relevant part:

> The Plan was established and is maintained for the benefit of a select
> group of management and highly compensated employees of Adecco,
> Inc. and its affiliates in order to provide those employees with certain
> deferred compensation benefits.

(Adecco, Inc. Non-Qualified Savings Plan, p. 1) (emphasis added).  This language tracks the ERISA

definition of a top-hat plan: "a plan which is unfunded and is maintained by an employer primarily

for the purpose of providing deferred compensation for a select group of management or highly

compensated employees."  29 U.S.C.A. §1051(2) (2005).  The parties do not dispute that the 2001

Plan was maintained for the benefit of highly compensated employees, and upon further scrutiny,

the Court is satisfied that the 2001 Plan indeed provides deferred compensation benefits to highly

compensated employees such as Plaintiff.  Accordingly, the Court finds that the 2001 Plan meets the

second part of the definition of a top-hat plan. As the 2001 Plan is both unfunded (within the

meaning of ERISA) and maintained for the benefit of a select group of highly paid employees, this

Court holds that the 2001 Plan meets ERISA's requirements for a top-hat plan.

**D.      Standard for Reviewing Committee's Determination**

Having determined that the 2001 Plan is a top-hat plan, exempt from the majority of ERISA's

substantive provisions, the Court now considers the appropriate standard for reviewing the

Committee's decision denying plaintiff $91,205.06 in employer matching funds.  The 2001 Plan is

fully administered by the Committee, which has plenary authority over most, if not all, aspects of

the Plan.  Section 10.5 of the 2001 Plan, discusses the level of deference given to Committee[5]

_____

[5] The words Committee and Plan Administrator will be used interchangeably throughout
this Opinion.  (Adecco, Inc. Non-Qualified Savings Plan, p. 31, Section 10.1: "The Company is

decisions:

> 10.5 <u>Decisions of the Committee</u>. All decisions of the Committee, any action taken by the Committee with respect to the Plan and within the powers granted to it under the Plan, and any interpretation of [a] provision of the Plan or the Trust Agreement by the Committee, shall be conclusive, and shall be given the <u>maximum possible deference</u> allowed by law.

(Adecco, Inc. Non-Qualified Savings Plan, p. 33) (emphasis added).

In <u>Goldstein v. Johnson & Johnson</u>, 251 F.3d 433, 435 (3d Cir. 2001), the Third Circuit summarized one of the principal holdings in <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989):

> [B]ecause ERISA plans are analogous to 'trusts' for employees, with the plan administrator serving as trustee, a reviewing court owes deference to the discretionary decisions of the administrator just as the discretionary decisions of a trustee would receive deference.

<u>Goldstein</u>, 251 F.3d at 435 (interpreting <u>Firestone</u>, 489 U.S. at 111).  Plaintiff relies heavily on Supreme Court's decision in <u>Firestone</u>, claiming that this Court should review the Committee's decisions, <u>de novo</u>.  He also relies on <u>Pinto v. Reliance Standard Life Ins. Co.</u>, where the Third Circuit held that the amount of deference awarded to the claim administrator's decision is only reduced where there is evidence the administrator's capacity for fairness was actually adversely affected  by the conflict of interest.  214 F.3d 377, 393 (3d Cir. 2000); <u>see also</u>, <u>Lasser v. Reliance Standard Life Ins. Co.</u>, 146 F. Supp. 2d 619, 623 (D.N.J. 2001) ("it is also clear that the beginning point of Pinto's sliding scale of heightened arbitrary and capricious review lies but a modest distance

---

hereby designated as the administrator of the [2001] Plan. The Plan Administrator hereby delegates to the Committee...the authority to carry out all duties and responsibilities of the Plan Administrator under the [2001] Plan.").

from the original standard, and that, absent other evidence of bias, the Court should engage in no more than a modicum of additional scrutiny.").

Plaintiff claims that the Committee's decisions should receive little or no deference under Pinto, because the Committee is operating under a conflict of interest:  "In this case, the company is the administrator of the plan it seeks to enforce against the plaintiff and, through its board, also appoints the committee that is generally charged with administration of the plan.  Under this scheme, the interests of the administrator, administrative committee and company conflict with the interests of plan participants and the plaintiff."  (Plaintiff's Brief in Support of Motion for Summary Judgment, pp. 20-21).  For the reasons outlined below, the reasoning in Pinto does not extend to cases involving top-hat plans.  Furthermore, the Third Circuit has previously held that the burden of demonstrating that heightened review should apply, lies with the claimant.  See, e.g., Kotrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Emples., 970 F.2d 1165, 1173 (3d Cir. 1992) ("Where the sponsor of a Plan reserves for the Plan administrators the discretion to interpret the Plan, anyone urging that a court disregard that reservation has the burden of showing some reason to believe the exercise of discretion has been tainted.").  Plaintiff has not provided this Court with any substantive evidence demonstrating a conflict of interest, aside from conclusory statements claiming that the Committee is operating under a conflict of interest.

Notwithstanding the holdings in Firestone and Pinto, these two decisions "were premised on the analogy of an ERISA plan to a traditional trust."  Goldstein, 251 F.3d at 436.  Top-hat plans, however, are different than other types of plans covered under ERISA.  See In Re: New Valley Corp., 89 F.3d 143, 148 (3d Cir. 1996) ("[T]op hat plans form a rare sub-species of ERISA plans, and Congress created a special regime to cover them.").  Accordingly, these plans should not be

analogized to traditional trusts.  The <u>Goldstein</u> Court elaborated on this idea, stating:

> Top hat plans are unfunded, they do not vest, and they are not required to name fiduciaries.  Under such circumstances, the analogy to trust law fails, and the plans are more appropriately considered as unilateral contracts, whereby neither party's interpretation is entitled to any more 'deference' than the other party's.

<u>Goldstein</u>, 251 F.2d at 436 (emphasis added) (relying on <u>In re New Valley</u>, 89 F.3d at 149 (top-hat plans are governed by the federal common law of contract); and <u>Kemmerer v. ICI Americas, Inc.</u>, 70 F.3d 281, 287 (3d Cir. 1995) (same)); <u>cf.</u> <u>Olander v. Bucyrus-Erie Co.</u>, 187 F.3d 599, 604 (7th Cir. 1999) (relying on <u>Firestone</u> when analogizing top-hat plans to trusts).  The Court will therefore apply the federal common law of contracts to the present facts.

Section 10.5 of the 2001 Plan grants the Committee the power to make conclusive decisions regarding the plan.  Furthermore, it directs that the decisions of the Committee should receive the maximum possible deference allowed by law.  The Committee's discretion to construe the terms of the 2001 plan, however, is subject to the implied duty of good faith and fair dealing.  <u>Goldstein</u>, 251 F.3d at 436 ("In accordance with ordinary contract principles, we conclude that, such clause has the potential to grant the plan administrator discretion to construe the terms of the plan, <u>subject to the implied duty of good faith and fair dealing.</u>") (emphasis added) (relying on Restatement (Second) of Contracts § 205 (1981)).  As the <u>Goldstein</u> Court correctly noted, "as with any other contract term . . . courts retain the power to conduct a de novo review as to whether a party has complied with its good faith obligations." <u>Id.</u> at 444.

Pursuant to its inherent authority to review <u>de novo</u> a party's compliance with the duty of good faith and fair dealing, this Court will now examine the Committee's decision denying plaintiff $91,205.06 in employer matching funds and accrued investment.  Absent proof of bad faith, this

Court will not disturb the Committee's determination.  The non-compete clauses in the 2001 Plan

provide:

> 7.7.1 <u>Non-Compete Provisions</u> [D]istributions of the balance credited
> to (i) an Executive Participant's Employer Matching Account and (ii)
> Profit Sharing Accounts transferred from the ADIA/NQPSP, shall not
> be made until the date that is the later of (a) 12 months following
> termination of the Participant's employment with all employers and
> affiliates for any reason, and (b) the date the Committee receives
> proof satisfactory to the committee that the Participant has complied
> with Section 7.7. If the Participant fails to provide proof of
> compliance as required by Section 7.7, the balance credited to (a) an
> Executive Participant's Employer Matching Account, and (b) an
> Executive or Colleague Participant's Employer Discretionary
> Contribution Account and ADIA Profit Sharing Account, shall not be
> distributed and shall instead be forfeited.

> 7.7.2 <u>Prejudicial Actions</u> [A] participant who acts in a manner
> prejudicial to the interests of the Employer shall forfeit all amounts
> in his Account. A Participant shall be deemed to have acted in a
> manner prejudicial to the interests of the Employer if, at any [time]
> within (1) year after termination of employment, the Participant
> engages in any activity in competition with any business activity of
> the Employers, or inimical, contrary of harmful to the interests of the
> Employers, including but not limited to: (a) . . . ;(b) . . . ; and (c)
> Accepting employment with, or serving as a consultant, advisor or in
> any other capacity to, an employer which is in competition with, or
> acting against, the interests of the Employers.

> 7.7.3 <u>Evidence of Non-Compete</u> The Participant shall be required to
> prove that he or she has not acted in a manner prejudicial to the
> interests of the Employers pursuant to this Section 7.7. If the
> Participant fails to provide evidence . . . he or she shall be deemed to
> have violated the terms of this Section 7.7 and his or her account
> balance shall be forfeited.

(Adecco, Inc. Non-Qualified Savings Plan, pp. 21-23).  Defendants claim that plaintiff breached the

non-compete clauses in the EDCP[6] and 2001 Plans.  The Committee concluded that plaintiff's

---

[6] The non-compete provision in the EDCP provides, in relevant part: "[I]f a participant
who is entitled to receive a benefit under this plan . . . engages in competition with the Company

business activities, along with his alleged failure to produce evidence of non-competition placed him in violation of the 2001 Plan's non-compete provisions.  (Def's Br. in Supp., p. 8).  They claim the decisions to deny plaintiff the sum in question were reached in good faith, and after careful review and consideration of the evidence before them.  (Id.).  In its denial letter, the Committee states: "You [plaintiff's counsel] have not produced, and the Company is not aware of, any contrary evidence that would indicate that Mr. Violette did fully comply with the Plan's non-compete rules." (Letter from Thomas Lucas to plaintiff, dated April 3, 2003).   Plaintiff, on the other hand, contends that defendants' decisions denying him $91,205.06 in employer matching funds and accrued investment from his EDCP account, were reached in bad faith.  He further argues that defendants acted in bad faith when denying his appeal.  For the reasons set forth below, this Court agrees with plaintiff's position and holds that defendants acted in bad faith when denying plaintiff the disputed sum.

"Ordinary contract principles require that, where only one party is granted discretion under the terms of a contract, that discretion must be exercised in good faith -- a requirement that includes the duty to exercise the discretion reasonably." Goldstein, 251 F.3d at 444. (relying on Restatement (Second) of Contracts § 205 (1981); and Berger v. Edgewater Steel Co., 911 F.2d 911, 919 (3d Cir. 1990) (holding that term in ERISA plan granting employer discretion to allow early retirement when "the Company considers that such retirement would . . . be in its interest" compels employer to exercise its discretion in good faith)).  "Under the implied covenant of good faith and fair dealing,

_____

. . . during the one year period commencing at the date of Termination of Employment of Retirement . . . payments thereafter payable hereunder from the Participant's Company Contribution Account to such Participant . . . will, at the discretion of the Committee, be forfeited . . ."(Executive Deferred Compensation Plan, pp. 11-12, Section 7.3).

neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Fields v. Thompson Printing Co., 363 F.3d 259, 270 (3d Cir. 2004); 13 Williston on Contracts §§ 38:15 (4th ed. 2000).  When determining whether a plan administrator had acted in bad faith, the Court in Goldstein looked to whether the administrator had acted "reasonably" and  used "best efforts" in evaluating the plaintiff's claim.  Goldstein, 251 F.3d at 440, 445.  Plaintiff in the instant case did not get the benefit of a reasonable inquiry involving the Committee's best efforts.

**E.  The Committee Acted in Bad Faith when Denying Plaintiff's Claim**

"[B]ad faith normally connotes an ulterior motive or sinister purpose." McPherson v. Employees' Pension Plan of Am. Re-Insurance Co., 33 F.3d 253, 256-257 (3d Cir. 1994). "The party claiming a breach of the covenant of good faith and fair dealing 'must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 864 A.2d 387, 396 (N.J. 2005) (relying on 23 Williston on Contracts §§ 63:22 (Lord ed. 2002); Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1130 (N.J. 2001); and Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997).  "A defendant may be liable for a breach of the covenant of good faith and fair dealing even if it does not violate an express term of a contract." Id. at 588.  "A plaintiff may be entitled to relief under the covenant if its reasonable expectations are destroyed when a defendant acts with ill motives and without any legitimate purpose." Brunswick Hills Racquet Club, 864 A.2d at 396 (quoting Wilson, 773 A.2d at 1130).

With respect to the issue of "reasonableness" of the Committee's decision, although

"questions of reasonableness of conduct and good faith are ordinarily for the judgment of the triers of the facts, . . . such are questions of law for the court when the facts are undisputed and not fairly susceptible of divergent inferences. Where, upon all the evidence, but one inference may reasonably be drawn, there is no issue for the jury." Broad & Branford Place Corp. v. J.J. Hockenjos Co., 39 A.2d 80, 82 (N.J. 1944); see also Restatement (Second) of Contracts § 212 (1981) ("A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law."); and Stern's Gallery of Gifts, Inc. v. Corporate Prop., 337 S.E.2d 29, 38-39 (Ga. App. 1985) ("the question of reasonableness or unreasonableness is most often a jury issue, in plain and palpable cases the determination may be made by the court . . . in the case at bar the issue was clearly one of law rather than of fact, and therefore properly for the court to decide.") While the above-cited cases dealt with the issue of bad faith in the context of commercial leases, the reasoning contained therein applies to the facts at hand, since it is well-established that in New Jersey, commercial leases are analyzed under ordinary contract principles. McGuire v. City of Jersey City, 593 A.2d 309, 314 (N.J. 1991); Ringwood Assocs., Ltd., v. Jack's of Route 23, Inc., 379 A.2d 508, 516 (N.J. Super. Ct. Law Div. 1977). As the underlying facts in this case are undisputed, and the case law points to only one reasonable inference, the issue of bad faith will be decided as a matter of law.

Under the terms of the 2001 Plan, a Participant is required to "prove that he or she has not acted in a manner prejudicial to the interests of the Employers pursuant to this Section 7.7." (Adecco, Inc. Non-Qualified Savings Plan, p. 23). In other words, Participants are required to prove

a negative; namely, that they have not competed with any of defendants' businesses anywhere, within

one year of the Separation Agreement.  The unreasonableness of this onerous burden is compounded

by the fact that the Committee provided plaintiff with little or no guidance regarding compliance

with the afore-mentioned burden.  Defendants wrote several letters to plaintiff, reminding him of his

duty to present evidence of non-competition and advising him that they believed his business

activities "violate the requirements of the Adecco Executive Non-Qualified Savings Plan."  (Letters

dated April 2, 2002 and May 2, 2002, sent by Stacy Wood, attorney for AOC, to Plaintiff).  The

April 2 letter warned plaintiff that AOC would be monitoring his business activities. (Id.).  The May

2 letter further reminded Plaintiff that defendants reserved the right to determine at the end of the

twelve-month period if he had met the requirements of the plan.  (Id.).  At no point, however, did

defendants provide plaintiff with meaningful assistance or guidance regarding the required proof of

non-competition.   The Court can find no legitimate purpose for the defendants' behavior.

Furthermore, defendants' conduct had the practical effect of denying plaintiff the "benefit of the

bargain originally intended by the parties."  Brunswick Hills Racquet Club, 864 A.2d at 396.

        While defendants were not required to safeguard the interests of plaintiff, they were required

to act in good faith.  The "good faith" effort defendants purport to have made, consisted of several

of cryptic letters, and one questionnaire provided by Greg Nevolla, none of which furnished the

plaintiff with any real guidance for meeting his burden.   When plaintiff was asked to provide

information, he did so promptly.  (Declaration of Greg Nevolla, Ex. 10).  On the other hand, when

plaintiff attempted to obtain information from defendants, his requests were ignored.  (Declaration

of Greg Nevolla, Ex. 11).  In a letter dated January 30, 2003, from plaintiff's counsel to defendants'

counsel, plaintiff's counsel commented that despite her request that the company contact her if they

needed additional information, she had not heard "anything about needing more information since [her] January 6[, 2003] letter . . ." (Declaration of Greg Nevolla, Ex. 11). The record clearly demonstrates that plaintiff and his attorney repeatedly tried to contact defendants to obtain information about plaintiff's duties under the 2001 Plan. His requests for information, however, were met with silence.

There is ample evidence of plaintiff's attempts to comply with the burden of proving non-competition, included, but not limited to his willingness to cooperate with defendants' requests for information  (Declaration of Greg Nevolla, Ex. 10, 11, 12). Plaintiff provided his W-2 Forms and financial information as soon as they became available. (Declaration of Greg Nevolla, Ex. 10, 12, 13, 14). Nonetheless, as previously stated, the Committee noted in its opinion: "You [plaintiff's counsel] have not produced, and the Company is not aware of, any contrary evidence that would indicate that Mr. Violette did fully comply with the Plan's non-compete rules." (Declaration of Greg Nevolla, Ex.15). As the evidence clearly demonstrates, plaintiff provided the Committee: (1) letters by plaintiff denying that he was competing with defendants' businesses; (2) plaintiff's W-2 [7] statement from 2002; (3) a completed financial questionnaire which defendants themselves provided; and (4) pay stubs and other financial statements. Notwithstanding, defendants, in their reply brief in support of their motion for summary judgment, assert that: "Except for Mr. Violette's own word that he was not competing, he presented no evidence that his business . . . was not in direct competition with Adecco, Inc. or its affiliates." (Reply Brief ISO Motion for Summary Judgment,

---

[7] The Court is convinced that defendants did in fact have plaintiff's 2001 W-2 statement in their possession, as they themselves issued it. Therefore, the Court disregards defendants contention that plaintiff did not provide them with his 2001 W-2 Form in a timely manner.

p. 10).  The record demonstrates otherwise.  It is also worth noting that at no point did defendants request additional evidence.  Defendants waited until after the Committee's initial denial of plaintiff's claim, to inform plaintiff that his evidence of non-competition was insufficient and inadequate.  Defendants' unwillingness to expound on the meaning of their non-competition clauses, and their refusal to provide plaintiff with a reasonable standard, are all evidence of bad faith on the part of defendants, and are visible throughout the record.

Defendants' bad faith in denying plaintiff's claim is further evidenced by their attempts to "bait" plaintiff into competing with their businesses.  On February of 2002, Sherrie Carnes, a paralegal employed by defendant's  law firm,  visited BMG's office in Charlotte, North Carolina.  In an attempt to engage plaintiff in prohibited activities, she misrepresented herself as a job-seeker looking for work as a paralegal.[8]  Ms. Carnes asked the Plaintiff whether BMG was a staffing service, to which he replied, "Yes, an executive search firm." (Affidavit of Sherry Carnes). She then asked for a brochure or a business card.  The Plaintiff gave her a business card and asked her name.  Ms. Carnes told him she had another appointment to go to and that she would contact him later.  When deciding to deny plaintiff the matching funds in question, the Committee relied on this affidavit, among other things.[9]  This affidavit is not only biased, but it was executed one year after Carnes visited plaintiff's office.  It is important to note that plaintiff never wrote down Carnes' information, he did not have her fill out an application, he never contacted her, he did not interview her, and he never attempted to secure a job for her.  (Affidavit of Sherrie Carnes).  In other words,

---

[8] By "prohibited activities," the Court refers to activities which are prohibited by the non-compete clauses in question.

[9] The Committee also relied on the contents of plaintiff's website and on the actual text of the plans.

Ms. Carnes' affidavit only proves that plaintiff was polite and treated her respectfully. Relying on this affidavit as proof of competition was clearly unreasonable as a matter of law.

The record unequivocally demonstrates that the Committee's original decision denying plaintiff's claim, was vague, ill-founded and replete with conclusory and incorrect statements. (Declaration of Greg Nevolla, Ex.15). The aforesaid actions of the Committee, the lack of transparency in their decision-making process and their poor documentation of allegedly competitive activities all support a finding that they acted in bad faith when denying plaintiff's claim for benefits. Accordingly, the Court finds that the Committee (and therefore the defendants) breached their duty of good faith and fair dealing when they exercised their discretion in denying plaintiff benefits under the 2001 Plan. The Committee's denial of plaintiff's appeal also evidences bad faith on the part of the Committee.

For the reasons set forth above, plaintiff's motion for summary judgment is granted in part, and defendants' motion for summary judgment is denied. Accordingly, the Court holds that the Committee acted in bad faith when denying plaintiff $91,205.06 in employer matching funds and accrued investment from plaintiff's EDCP. Nevertheless, there still remains a triable issue of fact as to whether the plaintiff competed with defendants' businesses.

**F.**   **Remaining Issues**

In defendants' Brief in Support of their Motion for Summary Judgment, they claim that plaintiff named the wrong defendants. In <u>Carducci v. Aetna U.S. Health Care</u>, the Court held that a claim for benefits under Section 502(a)(1) of ERISA may only be brought against the plan administrator or against the plan itself. 247 F. Supp. 2d 596, 607-608 (D.N.J. 2003). In the present

case, plaintiff brought suit against Adecco, NA and Ajilon Finance.  Defendants claim that Adecco, Inc. and not Adecco, NA or Ajilon Finance, is the proper defendant.  After thoroughly examining the text of the 2001 Plan, and considering the parties' submissions on the issue, the Court is convinced that plaintiff named the proper defendants.  As plaintiff correctly notes, paragraph 20 of defendants' responses to plaintiff's Statement of Undisputed Facts, cites as undisputed the fact that "On or about April 3, 2003, defendants informed plaintiff that they were the administrators of the 2001 Plan." (Defendants' Responses to Plaintiff's Statement of Undisputed Facts, p. 7, ¶20).  Under Rule 56.1 of the Local Civil Rules, "facts submitted in a statement of material facts which remain uncontested by the opposing party are deemed admitted."  Hill v. Algor, 85 F. Supp. 2d 391, 408, n.26 (D.N.J. 2000); see also Montville Twp. v. Woodmont Builders, LLC, 2005 U.S. Dist. LEXIS 18079, at * 26 (D.N.J. Aug. 12, 2005) ("Woodmont filed a statement of undisputed material facts pursuant to L. Civ. R 56.1, which the Township does not contest in its opposition brief.  Thus, the Court will accept as true Woodmont's uncontested statement of facts for the purposes of ruling on Count XI."); White v. Camden City Bd. of Educ., 251 F. Supp. 2d 1242, 1246 n.l (D.N.J. 2003) (deeming admitted facts stated in defendant's statement of facts and uncontested by plaintiff). Accordingly, the Court accepts the parties' statements of uncontested facts as conclusive, and holds that Adecco, NA and Ajilon Finance are the proper defendants.

## CONCLUSION

For the reasons set forth above, it is on this 29th day of September, 2005,

**O R D E R E D** that defendants' cross-motion for summary judgment [19] is DENIED; and it is further

**O R D E R E D** that plaintiff's motion for summary judgment [23] is GRANTED in part.


/s/ Jose L. Linares
JOSE L. LINARES,
UNITED STATES DISTRICT JUDGE

DATED: September 29, 2005